UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

STEVEN CANCRO,                                  :

             **Plaintiff,**                      :

             v.                                   :   **COMPLAINT**

CREDIT AGRICOLE INDOSUEZ                        :   05 Civ. 2023 (KMK)
SEVERANCE PAY PROGRAM and
ITS ADMINISTRATOR, and                          :
CALYON, AS SUCCESSOR IN INTEREST
TO CREDIT AGRICOLE INDOSUEZ,                    :

             **Defendants.**                      :
_____x

        **Plaintiff, Steven Cancro, by his attorneys Kraus & Zuchlewski LLP, as and for his complaint, alleges as follows:**

## INTRODUCTION

        1.    In this action, Plaintiff, the former First Vice President and Senior Counsel of the New York branch of Credit Agricole Indosuez ("CAI" or "Bank"), who was terminated in 2002, seeks payment of severance benefits in an amount commensurate to that paid to other comparable senior staff members of the Bank under CAI's *de facto* severance plan. Defendants's actions in failing to make such payments to Plaintiff violated the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§1001, et seq. ("ERISA") and have damaged Plaintiff.

## JURISDICTION

        2.    Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. §1331, this being a suit authorized and instituted pursuant to ERISA, 29 U.S.C. §1132 (a)(1)(b).

Jurisdiction as to Plaintiff's New York State law causes of action is conferred upon this Court by and under the principles of supplemental jurisdiction pursuant to 28 U.S.C. §1367.

## VENUE

3.  Pursuant to §502(e)(2) of ERISA, 29 U.S.C.§1332(e)(2), venue in this action lies in the Southern District of New York where the employee benefit plan at issue is located and administered and where the violations of ERISA have occurred. Additionally, the parties to this action reside in and/or regularly do business within the jurisdiction of this Court, and a majority of the events at issue in this action took place within the jurisdiction of this Court.

## THE PARTIES

4.  Steven Cancro is, and all times relevant to this complaint has been, a United States citizen and a resident of Yonkers, Westchester County, New York. During the entire period of Mr. Cancro's employment with CAI following the enactment of ERISA in 1974, he was an employee of CAI within the meaning of §3(6) of ERISA, 29 U.S.C. §1002(6), and was a participant in its employee benefit plans.

5.  Defendant Credit Agricole Indosuez, currently known as Calyon, is a French bank with an office and place of business in New York, New York.

6.  The Credit Agricole Indosuez Severance Plan is an employee welfare benefit plan within the meaning of ERISA, 29 U.S.C. §1002(3).

7.  At all times relevant herein, CAI was an employer within the meaning of ERISA, 29 U.S.C. §1002 (5), a plan administrator within the meaning of ERISA, 29 U.S.C. §1002 (16)(A), a plan sponsor within the meaning of ERISA, 29 U.S.C. §1002 (16)(B), and a fiduciary within the meaning of ERISA, 29 U.S.C. §1002 (21).

2

## FACTS

8. In 1984, Plaintiff Steven Cancro began his employment with Banque Indosuez as a Vice President and Associate Counsel.

9. In 1991, Mr. Cancro was promoted to First Vice President and General Counsel. In 1994, he was named First Vice President and Senior Counsel.

10. Mr. Cancro's responsibilities included, among other duties, being directly involved in all of CAI's legal matters in the United States; providing advice to CAI executives and staff on a wide range of commercial, investment and merchant banking activities; serving as Chief Compliance Officer for the Bank; and managing CAI's Legal Department.

11. In 1997, Banque Indosuez was acquired by CAI, and the combined entity became known as CAI.

**Plaintiff's ERISA Claim**

12. During the period that Mr. Cancro worked at Banque Indosuez, the bank maintained a severance plan for its employees.

13. Pursuant to the terms of the severance plan, as set forth in its Summary Plan Description, employees at Mr. Cancro's level were to receive one month of salary for each year of service if separated from the Bank other than for cause.

14. When CAI acquired Banque Indosuez, CAI largely adopted the severance formula contained in the Banque Indosuez plan and established a new severance plan called the Severance Pay Program.

15. In deciding to remain with CAI at that time, Mr. Cancro relied upon his belief, which was never contradicted by the Bank, that the terms of the Severance Pay Program

would remain in effect indefinitely; or, if they were later changed, any such changes would be fair, applied equitably to all affected and be consistent with the level of severance benefits previously provided by CAI to managers.

16. Under the Severance Pay Program, participants at Mr. Cancro's level and with his experience received from three to four weeks of severance per year of service upon separation.

17. CAI had a long-standing practice of failing to inform its employees of severance plan information or changes. For example, the Severance Pay Program plan documents were not distributed to any of the employees affected by them.

18. Upon information and belief, CAI's senior management believed that following this non-disclosure practice would permit them the flexibility to provide generous severance benefits to selected employees while denying them to others, regardless of the requirements of the severance benefit plan then in effect. A key criterion in determining which employees would receive lucrative severance packages was national origin.

19. Following a change in the Bank's management in 2001, CAI discontinued its existing severance plan, the Severance Pay Program, and replaced it with a different and less generous plan (the "Plan"). Under the Plan, severance was also based in part on years of service with the Bank, but was determined by a significantly altered severance pay formula.

20. Mr. Cancro was not advised that the Plan was being considered for adoption, nor was he told that it had been approved.

4

21. Upon information and belief, a major law firm retained by CAI in 2002 as a consultant on its internal practices cautioned the Bank that its severance schemes were vulnerable to claims that they violated provisions of ERISA.

22. On February 12, 2002, General Counsel Michael Walsh informed Mr. Cancro that his position was being eliminated and that he would be terminated without cause.

23. Mr. Walsh, however, had failed to clear this decision with one of Mr. Cancro's most important clients, the France Growth Fund, a New York Stock Exchange listed company managed by a wholly-owned French subsidiary of the Bank. Mr. Cancro served the Fund as its Vice President and Corporate Secretary. As a result of his role at the Fund, Mr. Cancro was asked to remain with the Bank until July 2002 to insure that the critical Annual Shareholder Meeting, over which he presided, was carried out successfully.

24. Thereafter, Mr. Cancro was offered a severance package pursuant to the Plan. The severance payment in the package, $58,538.60, represented only eighteen weeks of salary for an employee with more than seventeen years of service and had a highly detrimental impact upon Mr. Cancro's financial security.

25. As Senior Counsel, Mr. Cancro was aware of discussions regarding severance agreements that CAI was conducting with other terminated senior CAI staff members.

26. Upon information and belief, CAI applied the terms of the Plan only to Mr. Cancro and several other individuals, and disregarded its provisions by providing more substantial severance packages to all of the other comparable senior employees terminated during the period when Mr. Cancro was discharged.

27.     For example, upon information and belief, one high level bank official held a position similar to Mr. Cancro's and had been employed by the Bank for approximately the same period of time. Nonetheless, CAI failed to apply the provisions of the Plan to this individual, offering him a package consisting of 50 weeks salary with a cash value of $182,000 when he was terminated on March 31, 2002.

28.     Upon information and belief, another senior banker in a position equivalent to Mr. Cancro's and with no greater tenure at the Bank received a severance package which included a $300,000 payment in addition to significant future benefits at CAI's expense.

29.     Upon information and belief, other senior employees terminated by CAI in 2001 and 2002 with fewer years of service than Mr. Cancro and at a similar or lower level of the Bank's hierarchy than he have received severance payments significantly greater than what were provided to Mr. Cancro.

30.     One individual, or example, received more than one month of severance per year of service, nearly four times the amount of severance offered to Mr. Cancro. Three other senior ranking bank officers, all with two or fewer years of service at the time of their terminations, each received packages that included more than a year of severance.

31.     By consistently making severance payments substantially in excess of those provided for in the Plan to senior staff members other than Mr. Cancro, the Bank in practice adopted a new severance plan (the "New Plan").

32.     The severance payment scheme in the New Plan adopted by the Bank, which entailed making large severance payments to senior staff members, was not applied to Mr. Cancro.

33. Although the New Plan was not set forth in a formal written document, because a reasonable person could ascertain its intended benefits, class of beneficiaries, source of financing and procedures for receiving benefits, the New Plan is an employee welfare benefit pay plan.

34. A written plan containing the elements of the New Plan was finally promulgated by CAI in December 2002, six months after Mr. Cancro's departure from the Bank.

35. Mr. Cancro made several formal and informal inquiries, both individually and through counsel, to high level CAI executives addressing the question of application of the Plan to him and asserting that he should be provided with the same level of severance benefits as his peers who had been terminated and obtained benefits under the New Plan. These executives included Branch Manager Michael Malcolmson and Regional Counsel Francine Marx.

36. In each instance, CAI either rebuffed and denied Mr. Cancro's overtures and requests, or failed to respond to them outright. CAI made it completely clear that it had no intention of either providing Mr. Cancro with a level of severance commensurate with that provided to his peers or applying the Plan equally to all of those who fell under its terms. As a result, Mr. Cancro's efforts to exhaust administrative remedies were unsuccessful.

37. CAI's actions also demonstrated that any more concerted effort by Mr. Cancro to exhaust administrative remedies would have been futile.

38. Accordingly, the Plan administrator failed to meet his duty to Plan participants.

**Plaintiff's *Quantum Meruit* And Unjust
Enrichment Supplemental Claims**

39. In his capacity as First Vice President and Senior Counsel at CAI, Mr. Cancro was eligible to receive annual bonuses.

40. In 1995 and thereafter, Mr. Cancro each year received a substantial bonus for his efforts and accomplishments.

41. Throughout the late 1990s and up to the time of Mr. Cancro's departure, the Bank consistently followed a practice of paying *pro rata* bonuses to senior employees who left during the course of a calendar year.

42. Beginning in 1997, Mr. Cancro's annual bonus was paid by both CAI's New York Branch and CAI's Asset Management Group ("CAAM") in Paris. The New York branch and CAAM each contributed a portion of Mr. Cancro's total bonus.

43. Mr. Cancro's bonus was paid to him during the first three months of each calendar year for the preceding year.

44. Mr. Cancro's annual bonuses for 1997, 1998 and 1999 (paid in early 1998, 1999 and 2000, respectively) averaged $137,000. During none of these years was his bonus less than $130,000. Mr. Cancro's base salary increased incrementally, from $150,000 to $172,000, between 1995 and 2002.

45. Mr. Cancro's hours, level of effort and contributions to CAI were the same in 2000 and 2001 as they had been during the three preceding years.

46. In early 2001, Mr. Cancro received a bonus of only $75,000 for 2000.

47. In early 2002, Mr. Cancro received a bonus of only $50,000 for 2001.

48. Mr. Cancro received no bonus for the first half of 2002, a period during which he presided over the Annual Shareholder Meeting of The France Growth Fund. This assignment was a critical one for the French asset management affiliate of the Bank.

49. The services provided by Mr. Cancro to CAI in 2000 and 2001 were performed diligently and in good faith, and were accepted by the Bank. In early 2001 and early 2002, Mr. Cancro fully expected that the bonus share of his compensation for those years would reflect the value of his services at the same level as during the preceding three years.

## AS AND FOR A FIRST CAUSE OF ACTION

50. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45 of the Complaint with the same force and effect as if stated herein.

51. Defendants, by implementing the New Plan, created a *de facto* amendment of the Plan. By failing to pay Plaintiff in accordance with the terms of the New Plan, Defendants violated ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B). As a result Plaintiff has been deprived of benefits to which he is entitled under the Plan.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Pled in the Alternative)

52. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45 of the Complaint with the same force and effect as if stated herein.

53. Defendants' payment of severance in excess of the amount set forth in the Plan constitutes the establishment of a new plan. Because this new plan was not adhered to in determining the amount of severance offered to Plaintiff, Defendants violated ERISA

§502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B). Accordingly, Plaintiff has been wrongfully deprived of benefits to which he was entitled.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Supplemental State Law Claim)**

54.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45 of the Complaint with the same force and effect as if stated herein.

55.  Plaintiff, during 2000, 2001 and the first half of 2002, performed his services for CAI in good faith. Plaintiff's services were accepted by CAI, the entity to whom they were rendered.

56.  Plaintiff expected that he would be compensated fully and appropriately for his services in 2000, 2001 and the first half of 2002 by receiving bonuses commensurate to those he had been granted during the preceding three years, when his efforts and contributions to CAI were essentially the same as those in 2000 and 2001.

57.  The reasonable value of Plaintiff's services in 2000 and 2001, including base salary, was $309,000, and in 2002, was $154,500.

58.  Due to the reduction of his bonuses, Plaintiff was paid only $247,000 for 2000, $222,000 for 2001 and $86,000 for 2002.

59.  Under the principle of *quantum meruit*, CAI is obligated to pay Plaintiff an additional $62,000 for the fair value of his services during 2000, $87,000 for his services in 2001 and $68,500 for his services in 2002.

## AS AND FOR A FOURTH CAUSE OF ACTION
**(Supplemental State Law Claim)**

60. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45 as though fully stated herein.

61. As a result of its failure to pay Plaintiff annual bonuses for 2000, 2001 and 2002 which reflected the value of his work and contributions during those years and were consistent with his compensation for the same work in preceding years, CAI has received a benefit from Plaintiff's efforts and was unjustly enriched thereby.

62. Plaintiff's efforts in carrying out his responsibilities in 2000, 2001 and 2002 were not furnished on a voluntary basis, but were rendered with the expectation of being paid.

63. As a result of the efforts of the Plaintiff, Defendant CAI is indebted to Plaintiff and is obliged to pay Plaintiff the reasonable value of Plaintiff's services rendered thereto; to wit, the sum of Two Hundred Seventeen Thousand Five Hundred Dollars ($217,500.00).

**WHEREFORE,** Mr. Cancro respectfully prays that this Court:

64. Issue a declaratory judgment that Defendant's acts, policies, practices and procedures complained of violated Plaintiff's rights under ERISA;

65. Order Defendants to pay severance due and owing to Plaintiff in an amount provided by the amended severance pay plan or the newly created severance pay plan;

66. In the Third and Fourth Causes of Action, award to Plaintiff a money judgment of One Hundred Forty Nine Thousand Dollars ($149,000);

67. Award to Plaintiff his attorneys fees and costs; and

11

    68. Grant such further and additional relief as may to this Court seem just and proper.

Dated:  New York, New York
      January 10, 2005

                KRAUS & ZUCHLEWSKI LLP
                Attorneys for Plaintiff
                Steven Cancro
                500 Fifth Avenue, Suite 5100
                New York, New York 10110
                (212) 869-4646

                _____
                Geoffrey A. Mort (GM5254)